BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
ADAM M. BUCCI (327312)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
abucci@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW (*pro hac vice forthcoming*)
ANTHONY L. PARKHILL (*pro hac vice forthcoming*)
205 W. Randolph Street, #1630
Chicago, IL  60606
Tel: 312/621/2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| KYLE FRANKOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation<br><br>Defendant. | Case No. 3:25-cv-2300<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Case No.

BLOOD HURST & O' REARDON, LLP

00223859

CLASS ACTION COMPLAINT

Plaintiff Kyle Frankowski, individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to himself and on information and belief as to all other matters, by and through undersigned counsel, hereby brings this class action complaint against Defendant Ford Motor Company, and alleges as follows:

### NATURE OF THE CASE

1.     2021–23 Ford Bronco Sport and 2020-22 Ford Escape vehicles equipped with 1.5-liter engines ("Subject Vehicles" or "Vehicles") contain defective fuel injectors that can crack, leak fuel, allow fuel to accumulate on top of the engine, unexpectedly impair performance, and ultimately cause sudden, life-threatening vehicle fires. These defective fuel injectors render the Subject Vehicles dangerous and unsafe to own or operate. Plaintiff's 2021 Ford Bronco Sport caught fire unexpectedly while being driven in Muir Beach, California on March 31, 2024, as shown in the image below.



2.     Plaintiff and Class members are or were at risk of severe injury or death as a result of the defective fuel injectors. Subject Vehicles may suddenly lose power while driving on highways

BLOOD HURST & O' REARDON, LLP

00223859

or busy roads, creating a collision risk, and Subject Vehicles have also burst into flames, risking the lives and property of Plaintiff, Class members, and the public at large.

3.  Consumers rely on automakers, such as Defendant, to promptly inform them and initiate a remedy or countermeasure when it discovers a vehicle model contains a defect, especially one that puts the safety of themselves and their passengers at serious risk.

4.  Defendant has represented that its vehicles are safe. Defendant's customers reasonably expect their vehicles to perform as represented by Defendant. Contrary to this promise and expectation, Subject Vehicles were designed, manufactured, and sold with defective fuel injectors that pose a substantial risk to the life and safety of drivers and passengers. This defect may manifest suddenly and unexpectedly and creates a life-threatening situation.

5.  Ford has long known that the fuel injectors on Subject Vehicles were defective through various sources including: (1) its own records of customer complaints; (2) dealership records; (3) records from and to the NHTSA; (4) warranty and post-warranty claims; and (5) pre-sale durability testing.

6.  Despite its knowledge of the safety risks and high repair expenses associated with this defect, Ford failed to disclose the existence of the defect to Plaintiff, other Class members, and the public. If Ford had disclosed this information, either through its dealers or the media, Plaintiff would have had access to the information. Nor has Ford paid for the repairs, offered to reimburse Subject Vehicle owners for costs incurred as a result of this defect (including total vehicle loss and destruction of personal property), or issued a recall that resolves the defect. Rather, Defendant has allowed the dangerous defect and vehicle fires to continue.

7.  Plaintiff and Class members purchased and leased Subject Vehicles that are of a lesser standard, grade, value, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.

8.  As a result of Defendant's unfair, deceptive, and/or fraudulent conduct, owners of Subject Vehicles have suffered loss of money and/or lost value. Plaintiff and Class members have suffered injury in fact and incurred damages.

BLOOD HURST & O' REARDON, LLP

**JURISDICTION AND VENUE**

9.     The Court has jurisdiction over Plaintiff' claims pursuant to 28 U.S.C. § 1332(d) because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class members are citizens of states that are diverse from Defendant's citizenship; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

10.     Venue is proper in this judicial District under 28 U.S.C. § 1391(b) because a substantial part of the challenged conduct or omissions giving rise to claims occurred and/or emanated from this District and Defendant has caused harm to Class members residing in this District.

**INTRADISTRICT ASSIGNMENT**

11.     Pursuant to Civil L.R. 3-2(c) and (d), assignment to the San Francisco Division is proper because a substantial part of the conduct which gives rise to Plaintiff's claims occurred in Marin County or a substantial part of the property that is the subject of this action is situated in Marin County, where Plaintiff's vehicle fire occurred.

**PARTIES**

12.     Plaintiff Kyle Frankowski resides in, and is a citizen of, the State of California. On or around July of 2021, Mr. Frankowski, who resides in Alhambra, purchased a 2021 Ford Bronco Sport in Montebello, California. While driving his Subject Vehicle on March 31, 2024, the vehicle burst into flames. As a result of the defective fuel injector and resulting fire, Plaintiff's vehicle was destroyed, along with Plaintiff's personal property located in the vehicle.

13.     Defendant Ford Motor Company ("Ford") is incorporated in the State of Delaware and is headquartered in Dearborn, Michigan. Ford sells, markets, distributes, and services Ford and Lincoln vehicles in California and throughout the United States, including Subject Vehicles. Ford established and operates the Ford Research and Innovation Center in Palo Alto, California.

BLOOD HURST & O' REARDON, LLP

00223859

3

Case No.

**FACTUAL BACKGROUND**

**A.      The Fuel Injector Defect**

14.      The Ford Bronco Sport is a compact crossover SUV that debuted in model year 2021. The Ford Escape is a compact crossover SUV that debuted in 2001 and has gone through various design iterations in its 25 years on the market.

15.      Ford has long been aware that the Subject Vehicles suffer from serious fuel injector defects that pose a risk of catastrophic engine compartment fires. On August 18, 2022, Defendant's Critical Concern Review Group began an investigation into a pattern of under hood fires occurring in the Subject Vehicles. By that time, Defendant was aware of 36 total reports of under hood fire for model years 2020-22 1.5L Bronco Sport and Escape vehicles.

16.      Critically, two of the vehicles that caught fire—a 2022 Escape and a 2022 Bronco Sport—had already undergone inspection and "passed" under Ford's earlier safety recall, identified as Ford Recall 22S21 (NHTSA Recall No. 22V-191). That earlier recall involved a known risk of oil leaks from the oil separator, which could cause fires if the leaking oil contacted hot surfaces under the hood. Ford's discovery that vehicles continued to catch fire despite having been "cleared" under Recall 22V-191 should have immediately alerted Ford to the fact that the true root cause of these fires had not been fully identified or corrected.

17.      On November 18, 2022, Defendant submitted to NHTSA recall number 22V-859000, relating to 2021-2023 Ford Bronco Sport and 2020-2023 Ford Escape vehicles.[1] This included all vehicles previously recalled under the first recall described above. This second recall identified a defect wherein "a fuel injector may crack, resulting in fuel and/or fuel vapor migrating to and/or accumulating near ignition sources resulting in potential under hood fire" and further identified that "liquid fuel and/or fuel vapor that accumulates near a sufficiently hot surface below the combustion initiation flame speed, may ignite resulting in an under hood fire, and increasing the risk of injury."

---

[1]      Ford later removed model year 2023 Ford Escape vehicles from recall number 22V-859000.

Blood Hurst & O' Reardon, LLP

18. By November 1, 2022—before this second recall was even submitted—Ford was already aware of at least fifty-four reports alleging under hood fires involving model year 2020-2022 Bronco Sport and Escape vehicles with the 1.5L engine. These fires involved vehicles that had already been subject to the prior recall (22V-191) and were incorrectly deemed "safe" after passing the inspection performed under that recall.

19. Ford's second recall (Ford Recall 22S73, NHTSA Recall 22V-85900) did not actually fix the defective fuel injectors. Instead of replacing the defective fuel injectors, Ford's proposed "remedy" merely involved a software update to the engine control software to, *inter alia*, detect fuel pressure drops and display an electronic warning message, along with placing the vehicle into "limp home mode." Ford also installed a drain tube to "allow fuel to drain from the cylinder head drain hole, away from surfaces which may initiate combustion, to the ground below the vehicle"—essentially directing fuel leaks to the ground rather than eliminating the defect.

20. This so-called recall remedy was dangerous and grossly inadequate. Unfortunately, as evidenced by Plaintiff's experience, the recall program did not eliminate the risk of serious vehicle fires in Subject Vehicles, nor did it actually repair or remove the defective fuel injectors responsible for the fires in the first place. Rather than addressing the root cause—defective fuel injectors prone to cracking and leaking—Ford merely created a system to detect leaks after they occurred.

21. Plaintiff is not alone in his experience. NHTSA has received numerous other complaints of similar stories. For example, in one complaint submitted to NHTSA on December 18, 2024, a vehicle owner claimed that a 2021 Bronco Sport suddenly caught fire in Pasadena, CA while the owner was driving their children to school on December 11, 2024.[2] In another complaint, an owner of a 2022 Ford Bronco Sport reported their vehicle caught fire while being driven and "was

---

[2] https://www.nhtsa.gov/?nhtsaId=11631525 (last accessed Mar. 4, 2025) ("The car caught fire the morning of Dec 11, 2024 while the vehicle's owner was driving their children to school. There are photos and a fire report is being generated. The vehicle's owner and her children could have been killed.").

Case No.

BLOOD HURST & O' REARDON, LLP

00223859

BLOOD HURST & O' REARDON, LLP

1  quickly engulfed in flames" after the vehicle had already received the repair under recall number

2  22V-859000.[3]

3       22.    Ford's handling of both Recall 22S21 and Recall 22V-859000 reflects a disturbing

4  pattern of misdiagnosis, delay, and half-measures, placing drivers and passengers at risk. The first

5  recall incorrectly blamed oil separator leaks, allowing dangerous fuel injector defects to go

6  undetected and unrepaired. When the truth could no longer be ignored, Ford issued a second recall

7  that again failed to meaningfully address the defective parts, leaving vehicle owners like Plaintiff

8  exposed to an ongoing risk of catastrophic under hood fires.

9  **B.      Ford Knew the Subject Vehicles Were Defective**

10      23.    Defendant is experienced in the design and manufacture of consumer vehicles. In

11 keeping with industry standards, Defendant conducts tests, including pre-sale durability tests, on

12 incoming components, including fuel injectors, to verify the parts are free from defect and comply

13 with Defendant's specifications.[4] It also "has developed state-of-the-art analytical tools, methods,

14 and computer simulations to complement [its] engineering analyses and full suite of crash testing,

15 at the component, sub-systems, and full vehicle system levels."[5] Moreover, under the TREAD Act,

16 49 U.S.C. § 30118, Defendant is duty-bound to, and does, monitor complaints from consumers that

17 are posted on NHTSA's website. As set forth herein, there were numerous consumer complaints on

18 NHTSA's website about this defect in Defendant's Subject Vehicles. Thus, Defendant knew or

19

20 ─────────────────────

21 [3]      https://www.nhtsa.gov/?nhtsaId=11584401 (last accessed Mar. 4, 2025) ("The contact owned a 2022 Ford Bronco Sport. The contact stated that while the son was driving at approximately

22 60 MPH, smoke was seen coming from under the hood. After driving over to the shoulder and exiting the vehicle, the vehicle was quickly engulfed in flames.").

23 [4]      Defendant employs "[a] full suite of engineering analyses, computer simulations and component, subsystem and full-vehicle crash." *Integrated Sustainability and Financial Report

24 2023*, Ford, https://corporate.ford.com/content/dam/corporate/us/en-us/documents/reports/2023-integrated-sustainability-and-financial-report.pdf (last accessed Feb. 27, 2025); *see also* Akweli

25 Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it

26 allows manufacturers to work out all the kinks and potential problems of a model before it goes into full production.") (last accessed Mar. 4, 2025).

27 [5]      *Integrated         Sustainability         and         Financial         Report         2024*,         Ford, https://corporate.ford.com/content/dam/corporate/us/en-us/documents/reports/2024-integrated-

28 sustainability-and-financial-report.pdf (last accessed Mar. 4, 2025).

should have known the fuel injectors were defective and prone to put drivers in a dangerous position due to the inherent risk of the defect.

24.     Additionally, Defendant learned or should have learned of this widespread defect from the sheer number of reports received from dealerships. Defendant's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the defect. Defendant's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. Indeed, Defendant's Code of Conduct states that it will "[t]ake seriously any safety concerns or product complaints, and address them appropriately."[6]

25.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide Defendant with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to Defendant because they will not be reimbursed for any repairs unless the justification is sufficiently detailed. Defendant claims "[w]arranty repairs are a key metric to measure initial quality."[7]

26.     Further, as set forth above, the TREAD Act requires automakers like Ford to be in close contact with NHTSA regarding potential defects, and therefore Ford should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles. From its monitoring of the NHTSA databases, vehicle inspections and warranty claims, Ford knew or should have known of the many fuel injector defect complaints, such as those described herein.

---

[6]     *Code of Conduct*, Ford, https://corporate.ford.com/operations/governance-and-policies/code-of-conduct/en/index.html#/lessons/MCN0747KM94Ul5rUnIMv-i9RzhMPwb-O (last accessed Mar. 5, 2025).

[7]     *Integrated Sustainability and Financial Report 2024*, *supra*, n.5.

BLOOD HURST & O' REARDON, LLP

27. As demonstrated by the numerous reports of vehicle fire that occurred after Ford's first and second recalls, the recalls failed to resolve the issue.

28. There are safer and non-problematic alternative designs available. Vehicles are required to be designed in such a manner that they do not leak gasoline and do not have an unreasonable risk of fire.

**C.** **Plaintiff's Experience**

29. Plaintiff Kyle Frankowski resides in Alhambra, California. He owned a 2021 Ford Bronco Sport, which he purchased in Montebello, California, from a Ford dealership in or around July of 2021. His vehicle bears Vehicle Identification Number: 3FMCR9C62MRA92558.

30. Prior to purchasing the vehicle, Mr. Frankowski visited a Ford-authorized dealership and visited Ford's website to research the vehicle. Mr. Frankowski regularly took his Bronco Sport to Ford dealerships for repairs and routine maintenance.

31. Mr. Frankowski took his Subject Vehicle to a Ford dealer for repairs, including the recall repair associated with recall number 22V-859000, before the vehicle was completely destroyed by the fire that occurred on March 31, 2024. Ford failed to repair the defective fuel injectors.

**D.** **The Limited Remedies' Failure of Their Essential Purpose**

32. Given the inherently defective nature of the Vehicles and their propensity to malfunction (or continue to malfunction) and require repair, and given Ford's inability to repair the defect and its non-disclosure and affirmative concealment of these facts, enforcement of the unilaterally imposed durational and damage limits of the express warranty would so oppress and surprise Plaintiff and Class members as to render these durational and damage limits unconscionable, and hence unenforceable.

33. Under the applicable warranty, Plaintiff and Class members are entitled to the repair and replacement of defective parts. However, because the defect persists after any repairs and replacements authorized by Defendant are made, and because Defendant knew that these actions were insufficient to cure the defect, Plaintiff and Class members are left without any remedy under

a warranty to correct the defect. Indeed, Defendant has had numerous opportunities to correct the defect but has failed to do so.

34. When Class members present their Vehicles for a defect-related repair, Ford is unable to remedy the defect. This failure is exemplified by Plaintiff's own experience—despite receiving Ford's so-called recall repair, his Vehicle still experienced the very defect the repair was intended to address, ultimately resulting in the complete destruction of his Vehicle. The so-called remedy was not merely inadequate; it was wholly ineffective and dangerously misleading, giving Class members a false sense of security while leaving them exposed to the ongoing risk of catastrophic failure and vehicle fires. Continued presentment of Vehicles by Plaintiff and class members to Ford in hopes of a repair or remedy would thus be futile, as Ford has demonstrated an inability or unwillingness to implement a true fix. Simply put, Ford's express warranty fails its essential purpose, depriving Class members of the fundamental benefit of their bargain—reliable and operational Vehicles that are safe and free of material defects.

35. The warranty service provided at Ford's dealerships and Ford's other agents' facilities failed to fix the problems with the Vehicles. As a result of Defendant's failure to properly or adequately repair the Defect, Plaintiff suffered direct and reasonably foreseeable incidental damages and did not have the benefit of a safe and reliable Vehicle.

## CLASS ACTION ALLEGATIONS

36. Plaintiff brings this class action pursuant to Fed. Civ. P. 23(a) and (b)(3) on behalf of a proposed Class defined as:

> All owners and lessees of Ford's model year 2021, 2022, or 2023 Ford Bronco Sport or 2020, 2021, or 2022 Ford Escape vehicles purchased or leased in the United States and its territories.

Excluded from the Class are: (a) Ford Motor Company, its officers, directors, and employees; its affiliates and affiliates' officers, directors, and employees; its distributors and distributors' officers, directors, and employees; and Ford Dealers and Ford Dealers' officers and directors; (b) Plaintiff's Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly exclude themselves from the Class.

BLOOD HURST & O' REARDON, LLP

37.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

38.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Class likely consists of over 500,000 people. Therefore, the Class is so numerous that joinder of all members would be impracticable.

39.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including:

a.    whether Subject Vehicles are defective;

b.    whether Subject Vehicles' defects constitute a safety risk;

c.    whether Ford misrepresented the standard, quality, and characteristics of Subject Vehicles;

d.    whether Ford's misrepresentations regarding the standard, quality, and characteristics of Subject Vehicles were likely to mislead reasonable consumers;

e.    whether Ford's omission regarding defective fuel injectors on Subject Vehicles were faulty was a material fact that a reasonable consumer would be expected to rely on when deciding whether to purchase or lease a Subject Vehicle;

f.    whether Plaintiff and the other Class members have been damaged and, if so, the extent of such damages; and

g.    whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution and injunctive relief.

40.    Ford engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

BLOOD HURST & O' REARDON, LLP

Case No.

CLASS ACTION COMPLAINT

00223859

Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

41. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class members because, among other things, Plaintiff and the other Class members were injured through Ford's substantially uniform misconduct described above. Plaintiff advance the same claims and legal theories on behalf of himself and all other Class members, and no defense is available to Defendant that is unique to any one class member.

42. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members. Additionally, Plaintiff has retained counsel competent and experienced in complex class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

43. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, providing the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

### Violation of California Consumers Legal Remedies Act

44. Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

Case No.

BLOOD HURST & O' REARDON, LLP

00223859

45.     Defendant is a "person" under Cal. Civ. Code § 1761(c).

46.     Plaintiff and each of the Class members are "consumers," as defined by Cal. Civ. Code § 1761(d), because they purchased or leased one or more Subject Vehicles for personal, family, or household purposes.

47.     Defendant's conduct, as described herein, in misrepresenting that the Subject Vehicles are safe and omitting the fact that it designed and manufactured Subject Vehicles with a uniform defect within the fuel injectors that can cause vehicle fires and other related problems, violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*. Specifically, Defendant violated the CLRA by misrepresenting and omitting material facts regarding Subject Vehicles, and by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions that were intended to result in, and did result in, the sale of Subject Vehicles:

    a.     representing that Subject Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

    b.     representing that Subject Vehicles were of a particular standard, quality, or grade if they are of another;

    c.     advertising Subject Vehicles with intent not to sell them as advertised; and

    d.     representing that Subject Vehicles have been supplied in accordance with previous representations when they have not.

48.     Defendant violated the Act by selling Subject Vehicles that it knew possessed uniform defects that caused the fuel injectors to leak and exposed the public to an unreasonable safety risk. Defendant omitted from Plaintiff and the other Class members, to whom it had a duty to disclose, the material fact that Subject Vehicles were sold with defective fuel injectors. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

49.     During any one of Plaintiff's multiple interactions with Ford dealerships, Ford could have disclosed the material fact of the defect, that would have resulted in Plaintiff receiving the information.

BLOOD HURST & O' REARDON, LLP

00223859

50.     Ford's recall was false and deceptive because they recommended a "fix"—a software update and drain tube—that did not resolve the fuel injector defect. The recall instituted by Ford was not adequate and Subject Vehicles are still defective.

51.     Pursuant to California Civil Code § 1782(d), Plaintiff, individually and on behalf of the other Class members, seeks a court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to extend repair remedies to all Class members, and awarding restitution and disgorgement.

52.     Pursuant to § 1782 of the Act, Plaintiff notified Defendant in writing of the particular violations of § 1770 of the Act and demanded that Defendant rectify the problems associated with the actions detailed above and notify all affected consumers of Defendant's intent to so act. A copy of the letter is attached as **Exhibit A**. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and or to give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act. Accordingly, Plaintiff also seeks damages proximately caused by Defendant's violation of the CLRA. Such damages include paying more for Subject Vehicles than they should have, expending time, effort, and money to repair or attempt to repair the defect, diminished value of Subject Vehicles, and other damages proximately caused by Defendant's misconduct as alleged herein.

53.     Defendant's conduct is fraudulent, wanton, and malicious, thereby entitling Plaintiff and the other Class members to punitive damages. Plaintiff also seeks attorneys' fees and costs as permitted by the CLRA.

54.     Pursuant to § 1782(d) of the Act, attached as **Exhibit B** is the affidavit showing that this action was commenced in the proper form.

### COUNT II

### Violation of California's Unfair Competition Law

55.     Plaintiff repeats and reallege all other paragraphs as if fully set forth herein.

56.     The Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendant committed

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1  "unlawful" business practices by, among other things, making the representations and omissions of

2  material facts, as set forth more fully herein, and violating California Civil Code §§ 1572, 1573,

3  1709, 1711, 1770(a)(5), (7), (9), and (16), the TREAD Act (49 U.S.C. § 30118) and its implementing

4  regulations, California Business & Professions Code §§ 17500, *et seq.*, and the common

5  law. Defendant had a duty to timely notify the Secretary of Transportation, pursuant to the TREAD

6  Act, upon receiving numerous complaints of the defect related to motor vehicle safety, but failed to

7  do so and instead, allowed the Subject Vehicles to be marketed and sold with the defective and

8  dangerous fuel injectors. Plaintiff, individually and on behalf of the other Class members, reserves

9  the right to allege other violations of the law, which constitute other unlawful business acts or

10  practices. Such conduct is ongoing and continues to this date.

11  57.  In the course of conducting business, Defendant committed "unfair" business

12  practices by, among other things, making the representations and omissions of material facts

13  regarding Subject Vehicles' fuel injectors. During any one of Plaintiff's multiple interactions with

14  Ford dealerships, Ford could have disclosed the material fact of the defect, and that would have

15  resulted in Plaintiff receiving the information. There is no societal benefit from such false and

16  misleading representations and omissions—only harm. While Plaintiff and the other Class members

17  were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is

18  "unfair," as it has offended an established public policy. Further, Defendant engaged in immoral,

19  unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

20  58.  Further, as set forth in this complaint, Plaintiff allege violations of consumer

21  protection, unfair competition, and truth in advertising laws in California and other states, resulting

22  in harm to consumers. Defendant's acts and omissions also violate and offend the public policy

23  against engaging in false and misleading advertising, unfair competition, and deceptive conduct

24  towards consumers. This conduct constitutes violations of the unfair prong of California Business

25  & Professions Code §§ 17200, *et seq*. There were reasonably available alternatives to further

26  Defendant's legitimate business interests other than the conduct described herein.

27  59.  California Business & Professions Code §§ 17200, *et seq.*, also prohibits any

28  "fraudulent business act or practice." In the course of conducting business, Defendant committed

00223859

"fraudulent business act[s] or practices" by, among other things, prominently making the representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Subject Vehicles.

60.     Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false or misleading and likely to deceive the consuming public within the meaning of California Business & Professions Code §§ 17200, *et seq*.

61.     Plaintiff, in fact, has been deceived as a result of his reliance on Defendant's material representations and omissions, which are described above. Plaintiff has suffered injury in fact and lost money as a result of purchasing one of the Subject Vehicles. Such injury includes paying more for Subject Vehicles than he should have, expending time, effort and money to repair or attempt to repair the defect, diminished value of Subject Vehicle, and other damages proximately caused by Defendant's misconduct as alleged herein.

62.     Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Plaintiff, on behalf of himself, all others similarly situated, and the general public, seeks restitution from Defendant of all money obtained from Plaintiff and the other Class members collected as a result of unfair competition, an injunction prohibiting Defendant from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with California Business & Professions Code § 17203.

## COUNT III

### Breach of Implied Warranty of Merchantability

63.     Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

64.     Defendant is and was, at all relevant times, a merchant with respect to Subject Vehicles, and manufactured, distributed, warrantied and/or sold Subject Vehicles.

65.     A warranty that Subject Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold or leased was implied by law in the instant transactions.

66.     Plaintiff and the other Class members purchased or leased Subject Vehicles manufactured and sold by Defendant in consumer transactions.

BLOOD HURST & O' REARDON, LLP

67.    Subject Vehicles, when sold and at all times thereafter, were not in merchantable condition and not fit for the ordinary purpose for which cars are used. Subject Vehicles left Defendant's possession and control with defective fuel injectors that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety. Plaintiff and the other Class members used their Subject Vehicles in the normal and ordinary manner for which Subject Vehicles were designed and advertised.

68.    Defendant knew before selling or leasing the Subject Vehicles to Plaintiff and the other Class members, or earlier, that the Subject Vehicles were manufactured with defective fuel injectors, rendering Subject Vehicles unfit for their ordinary purpose.

69.    Despite Plaintiff' and the other Class members' normal and ordinary use, maintenance, and upkeep, the fuel injectors of Subject Vehicles leak fuel as a result of a manufacturing or design defect that existed at the time Defendant transferred Subject Vehicles from its possession or control. The defect rendered Subject Vehicles unfit for their ordinary use and incapable of performing the tasks they were designed, advertised, and sold to perform.

70.    As a result, Subject Vehicles' fuel injectors are not of fair or average quality. Nor would they pass without objection in the automotive industry.

71.    All conditions precedent have occurred or been performed.

72.    Defendant had actual notice of its breach of warranty. Through consumer complaints, Defendant learned that the defect, the existence and ubiquity of which it knew much earlier, has been the subject of publicized consumer disputes nationwide. Its implementation of the recall directed to Subject Vehicles shows actual notice.

73.    Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first issued these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would observe or experience the defect. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention, and squandered its reasonable opportunity to cure or remedy the defect, its

breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect, cure its breaches of warranty, or otherwise attempt to resolve or address Plaintiff' and the other Class members' claims.

74.     As a direct and foreseeable result of the defect in Subject Vehicles' fuel injectors, Plaintiff and the other Class members have suffered diminution in the value of Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Subject Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

75.     Plaintiff and the other Class members have had sufficient direct dealings with Defendant or its agents (dealerships) to establish privity of contract between themselves and Defendant. This agency is factually supported by at least the following: 1) Ford issued a recall directing consumers to its dealerships to obtain a repair for the fuel injector defect; 2) Ford's warranty directs Subject Vehicle owners to present their vehicles to Ford-authorized dealerships for repairs; and 3) Ford requires dealerships to submit detailed data to it regarding repairs performed at dealerships.

76.     Privity, nevertheless, is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Subject Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiff and the other Class members. Privity is also not required because Plaintiff and the other Class members' Subject Vehicles are inherently dangerous due to the aforementioned defects and nonconformities.

## COUNT IV

### Fraud/Fraudulent Omission

77.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

BLOOD HURST & O' REARDON, LLP

78. Defendant actively, intentionally, and knowingly concealed, suppressed, and/or omitted material facts including the existence of the defect and the standard, quality, or grade of the Vehicles and the fact that the Vehicles contain defective fuel injectors and the corresponding safety risk, with the intent that Plaintiff and class rely on Defendant's omissions. As a direct result of Defendant's fraudulent conduct, as alleged herein, Plaintiff and members of the class have suffered actual damages.

79. Defendant knew, both at the time of sale or lease and afterward, that the Vehicles contained the defect, omitted material information about the safety of the Vehicles, and actively concealed the defect and never intended to adequately repair the fuel injector defect during the warranty periods. To date, Defendant has not provided Plaintiff and members of the class with an adequate repair or remedy for the defect.

80. Defendant possessed superior and exclusive knowledge regarding the defect and therefore had a duty to disclose any information relating to the safety and functionality of key safety features in the Vehicles.

81. The defect is material to Plaintiff and the members of the class because Plaintiff and the members of the class had a reasonable expectation that the Vehicles would not contain a defect that exposes them and others to a safety risk. No reasonable consumer expects a vehicle to contain a concealed defect in materials or workmanship, such as the defect as well as its associated safety risk.

82. Plaintiff and members of the class would not have purchased or leased the Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Vehicles and the existence of the fuel injector defect and corresponding safety risk, or would have paid less for the Vehicles.

83. Ford knew its concealment and suppression of the defect was false and misleading and knew the effect of concealing those material facts. Ford knew its misstatements, concealment, and suppression of the defect would sell more Vehicles and would discourage Plaintiffs and the members of the Class from seeking replacement or repair of the defect during the applicable warranty periods. Further, Defendant intended to induce Plaintiff and class members into purchasing

BLOOD HURST & O' REARDON, LLP

or leasing the Vehicles and to discourage them from seeking replacement or repair of the defect in order to decrease costs and increase profits.

84. Defendant acted with malice, oppression, and fraud.

85. Plaintiff and the members of the Class reasonably relied upon Defendant's knowing misrepresentations, concealment and omissions. As a direct and proximate result of Defendant's misrepresentations, omissions and active concealment of material facts regarding the defect and the associated safety risk, Plaintiff and the members of the Class have suffered actual damages in an amount to be determined at trial.

**COUNT V**

**Unjust Enrichment**

86. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

87. This claim is pleaded in the alternative to the other claims herein, and seeks restitution of ill-gotten gains.

88. As a direct and proximate result of Ford's omissions concerning and its failure to disclose the known fuel injector defect, Ford has profited through the sale and lease of the Vehicles and subsequently by profiting on the purchase of replacement parts and charging Plaintiff and other Class members for expensive repairs to their Vehicles when the engines inevitably fail. Although these Vehicles are purchased through Ford's agents, the money from the Vehicle sales flows directly back to Ford.

89. As a result of its wrongful acts, concealments, and omissions of the fuel injector defect in its Vehicles, as set forth above, Ford charged higher price for the Vehicles than the Vehicles' true value. Plaintiff and members of the class paid that higher price for their Vehicles to Ford's authorized distributors and dealers, which are in Ford's control.

90. Additionally, as a direct and proximate result of Ford's failure to disclose known defect in the Vehicles, Plaintiff and class members have Vehicles that will require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Ford.

BLOOD HURST & O' REARDON, LLP

91.     Ford has been unjustly enriched due to the known defect in the Vehicles through the receipt and use of money paid for the defective vehicles, sale of replacement parts, and performance of fuel injector repairs, that added to Ford's profits when said money should have remained with Plaintiff and the class members.

92.     As a result of Ford's unjust enrichment, Plaintiff and the class members have suffered damages.

93.     Equity and good conscience militate against allowing Ford to retain its ill-gotten gains, and requires disgorgement and restitution of the same.

## COUNT VI

### Declaratory Relief

94.     Plaintiff repeats and realleges all paragraphs as if fully set forth herein.

95.     Pursuant to 28 U.S.C. § 2201, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

96.     Defendant marketed, distributed, and sold Subject Vehicles equipped with faulty fuel injectors on account of Defendant's failure to design and manufacture the fuel injectors without defects.

97.     Accordingly, Plaintiff, individually and on behalf of the other Class members, seek entry of the following declarations: (a) Subject Vehicles contain faulty fuel injectors that are defective; (b) all persons who purchased or leased Subject Vehicles must be provided the best practicable notice of the defect, the cost of which shall be borne by Defendant; and (c) Defendant must establish an inspection, repair, and replacement program and protocol, and notify all Class members of such program and protocol, pursuant to which Defendant, including its authorized representatives, and at no cost to Class members, will replace the fuel injectors on Subject Vehicles.

### REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order:

BLOOD HURST & O' REARDON, LLP

Case No.

CLASS ACTION COMPLAINT

a.   certifying the Class under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as requested herein, and appointing his counsel as Class Counsel;

b.   appointing Plaintiff as Class Representative;

c.   finding that Ford engaged in the unlawful conduct as alleged herein;

d.   awarding Plaintiff and the other Class members compensatory and punitive damages;

e.   awarding Plaintiff and the other Class members restitution and disgorgement of monies Defendant acquired through its violations of the law;

f.   awarding Plaintiff and the other Class members injunctive and declaratory relief;

g.   requiring Ford to replace the defective fuel injectors on Subject Vehicles;

h.   awarding Plaintiff and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

i.   awarding Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses; and

j.   granting such other relief the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

Dated: March 5, 2025

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
ADAM M. BUCCI (327312)

By:        *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
abucci@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW (*pro hac vice forthcoming*)

BLOOD HURST & O' REARDON, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANTHONY L. PARKHILL (*pro hac vice forthcoming*)
205 W. Randolph Street, #1630
Chicago, IL  60606
Tel: 312/621/2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff*

BLOOD HURST & O' REARDON, LLP

00223859

22

Case No.

CLASS ACTION COMPLAINT